UNITED STATES, Appellant,

v.

Staff Sergeant Brian T. KONIECZKA,
384–70–0892, United States
Army, Appellee.

ACMR 9000001.

U.S. Army Court of Military Review.

26 March 1990.

Reconsideration Denied 26 April 1990.

For Appellant: Colonel Robert B. Kirby, J.A.G.C., Lieutenant Colonel Russell S. Estey, J.A.G.C., Captain Jeffrey J. Fleming, J.A.G.C., Captain Andrew G. Oosterbaan, J.A.G.C. (on brief).

For Appellee: Lieutenant Colonel Daniel J. Dell'Orto, J.A.G.C., Captain Martin D. Carpenter, J.A.G.C., Captain John J. Hogan, J.A.G.C. (on brief).

Before MYERS, JOHNSON and NEURAUTER, Appellate Military Judges.

## OPINION OF THE COURT

NEURAUTER, Judge:

Pursuant to Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 (Supp. II 1984) [hereinafter UCMJ], and Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial [hereinafter R.C.M.] 908(b) the government appeals a ruling by the military judge in this case suppressing the results of a urinalysis test which implicate appellee. These test results are essential evidence with respect to the Specification and Charge alleging wrongful use of marijuana in violation of Article 112a, UCMJ, 10 U.S.C. § 912a.

### I

Appellee submitted a urine sample as part of a unit urinalysis inspection on 17 April 1989. The samples, including appellee's, were forwarded to Mr. Christman, the Fort Lee Alcohol and Drug Control Officer, for prescreening to determine if any of the samples contained evidence of illegal drug use. Once the prescreening was completed, Mr. Christman randomly selected several samples that had tested negative for drugs. He also selected two other samples, including appellee's, which indicated the presence of the marijuana metabolite 11–nor–delta 9–tetrahydrocannabinol–9–carboxylic acid (THC), but which fell short of the level required to be identified as a positive sample (100 nanograms per milliliter). Mr. Christman then forwarded those selected samples to the drug testing laboratory at Fort Meade for further testing. Appellee's urine was tested at Fort Meade and determined to be positive for the presence of THC.

Mr. Christman testified during the motions hearing. The military judge questioned him about the testing and forwarding of appellee's urine sample:

MJ: Do you remember forwarding the drug sample in this case, in Sergeant Konieczka's case?

WIT: Extremely well. I do recall this.

MJ: Well, what was your purpose in selecting and forwarding his sample?

WIT: It had 93.5 nanograms on my machine and I was very confident that that one would come back confirmed. I know that the laboratories confirm at 15 nanograms and so if it—I forwarded it thinking that if it got past the RIA (radioimmunoassay) at the forensic lab it indeed would be confirmed. I only put an "N" on a chain of custody because as long as it's under the 100 on my machine I can't call it positive and this is a normal—I do this in the regular course of business all the time.

At the time he authenticated the record, the military judge attached special findings. Although not recited here verbatim, the more significant of those are as follows:

1. That Mr. Christman, by forwarding appellee's urine sample to Fort Meade for further testing, violated the provisions of Army Regulation (AR) 600–85, The Army Alcohol and Drug Abuse Prevention and Control Program, because the sample was not selected for that purpose on a random basis.

2. That Mr. Christman's action in forwarding the appellee's urine sample converted an inspection of the urine to a search because such action focused on an individual soldier and thus went beyond the scope of Mil.R.Evid. 313(b).

3. That such "search" was without probable cause and therefore prohibited by the fourth amendment of the United States Constitution.

### II

█ Chapter 10, Army Reg. 600–85, Personnel—General: Alcohol and Drug Abuse Prevention and Control Program (21 Oct. 1988) [hereinafter AR 600–85], outlines the policy objectives for the United States Army biochemical testing program,[1] the

---

1. AR 600–85, para. 10–1c states that the objectives of biochemical testing are as follows:

(1) Early identification of alcohol or drug abuse.

purposes for which the tests may be administered,[2] the types of testing programs, the responsibilities assigned for management and implementation of the programs, and the procedures to be used in taking the samples and testing them.

Urine or alcohol breath tests for active duty military personnel may be directed by a commander or a physician, or administered during the rehabilitation or treatment process. Specifically, AR 600–85 provides that a commander may direct a urinalysis of part or of the entire unit as an inspection. *See* AR 600–85, para. 10–3a. There is no indication in the record that the inspection which resulted in the taking of appellee's urine sample was improperly ordered or conducted. Appellee concedes that the process, at least until after his

(2) Deterrence of drug abuse.

(3) Monitoring of rehabilitation progress for those who require testing as part of their rehabilitation plan.

(4) Development of data on the prevalence of alcohol and drug abuse within the Army.

2. AR 600–85, para. 10–2 provides that tests may be taken:

*a.* To determine a soldier's fitness for duty and the need for counseling, rehabilitation, or other medical treatment.

*b.* To determine the presence of controlled substances in a soldier's urine or blood content during participation in the ADAPCP (Army Drug and Alcohol Prevention and Control Program).

*c.* To gather evidence to be used in actions under UCMJ.

*d.* To gather evidence to be used in administrative actions.

*e.* To determine the presence of controlled substance in a soldier's urine or blood content for a valid medical purpose.

*f.* To determine the presence of controlled substance in the urine soldiers [sic] or the blood alcohol content during inspections.

*g.* To serve as a safeguard at social gatherings where alcoholic beverages are served to individuals who might otherwise not realize how much alcohol they have consumed.

3. The pertinent portions of Mil.R.Evid. 313 are as follows:

(a) General rule. Evidence obtained from inspection and inventories in the armed forces conducted in accordance with this rule is admissible at trial when relevant and not otherwise inadmissible under these rules.

(b) Inspections. An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of

sample was prescreened for the existence of drug metabolites, was in compliance with Manual for Courts–Martial, United States, 1984, Mil.R.Evid. [hereinafter Mil.R. Evid.] 313.[3]

The procedures for urine drug prescreening (field testing) are outlined in AR 600–85, para. 10–7, which provides that, although the primary means of testing drug specimens is through a Department of Defense certified laboratory (such as that which exists at Fort Meade), installations may, through use of approved drug detection systems, make preliminary determinations regarding the absence or presence of drug metabolites in urine specimens. Mr. Christman testified that, after consultation with the Fort Lee installation commander, the decision was made to utilize this pres-

command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband. *An order to produce body fluids, such as urine, is permissible in accordance with this rule. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule.* If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule. Inspections shall be conducted in a reasonable fashion and shall comply with Mil.R. Evid. 312, if applicable. Inspections may utilize any reasonable natural or technological aid and may be conducted with or without notice to those inspected. Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized. (Emphasis added).

creening procedure at Fort Lee to allow the commanders there to continue testing the same number of soldiers despite the reduction in the number of specimens they were authorized to send to the laboratory at Fort Meade. The key procedural provisions for the prescreening of urine samples are as follows:

1. "Negative" samples *may* be discarded unless they are submitted to the main laboratory for quality control purposes in accordance with Appendix F, AR 600–85.

2. "Positive" specimens must be immediately forwarded to the main laboratory for testing.

3. The prescreening must follow operational procedures as outlined in Appendix F, AR 600–85.

4. Urine specimens may be retested upon the request of the submitting installation or command.[4]

(Emphasis added). AR 600–85, Appendix F, Standard Operating Procedures for Installation Urine Drug Prescreening, provides guidance for operation of the equipment used in the prescreening process and outlines quality assurance procedures. Paragraph F–3*a* (4) states that between two and ten percent of prescreened negative specimens are to be forwarded to the main laboratory for testing as an internal quality control check. There is no requirement that the selections be made on a random basis. The purpose of forwarding negative samples is to insure that the urine prescreening is being properly conducted.

We thus conclude that Mr. Christman acted within his authority under the provisions of AR 600–85 in selecting appellee's urine sample for forwarding to Fort Meade for testing. However, we must still determine whether Mr. Christman's decision to select appellee's sample converted a legitimate inspection into an unauthorized search conducted in violation of the fourth amendment.

III

In examining this issue, we must look at three factors: the primary purpose of the inspection, the scope of the inspection process, and the reasonableness of the inspection in light of Mil.R.Evid. 313(b) and applicable case law.

Appellee's urine sample was submitted for testing as part of a unit inspection to determine if it contained any evidence of drug use. Such testing is specifically authorized even though one of the purposes of the test may be prosecution of individuals who are determined to have used drugs. *See United States v. Rodriguez*, 23 M.J. 896 (A.C.M.R.1987). An otherwise valid urinalysis inspection, however, may be transformed into a search which would require probable cause if the primary purpose, at its inception or at anytime during the testing process, was to prosecute individual soldiers. *See United States v. Johnston*, 24 M.J. 271, 274 (C.M.A.1987), *cf.* Mil.R.Evid. 313(b) ("(a)n examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule.").

Although it does not involve an inspection of body fluids, *United States v. Ellis*, 24 M.J. 370 (C.M.A.1987), provides helpful guidance on the permissible scope of an inspection. As a general rule, "[t]he reasonableness of an inspection is determined by whether the inspection is conducted in accordance with the commander's inspection authorization, both as to the area to be inspected and as to the specific purposes set forth by the commander for ordering the inspection." *Id.* at 372 (citing *United States v. Brown*, 12 M.J. 420 (C.M.A.1982); *United States v. Middleton*, 10 M.J. 123 (C.M.A.1981)). Further, "[e]ven if the intrusion is not specifically authorized by the terms of the inspection, it may still be

4. AR 600–85, para. 10–8*a* states that retesting will be accomplished as follows:

(1) *Upon request of the submitting installation/command, the soldier, or the attorney representing the service member.* All requests must be forwarded through the submitting installation/command to the Army laboratory performing the initial test.

(2) Upon request of an administrative board under rules applicable to the board.

(3) Upon order of a court-martial or rules applicable to the court-martial.

upheld if the purposes of the inspection would be served by the challenged activity." *Ellis*, 24 M.J. at 372 (citing *United States v. Jasper*, 20 M.J. 112 (C.M.A.1985); *United States v. Law*, 17 M.J. 229 (C.M.A. 1984)).

█ Applying these principles to the case now before us, we conclude, based upon the facts and circumstances of this case, that the inspection was reasonable and complied with the commander's authorization, and the results therefore could have been properly admitted under the provisions of Mil.R.Evid. 313(b).

The purpose of this inspection was to check the urine of appellee and other members of the same unit for the presence of drugs, and was therefore a legitimate exercise of the commander's power and authority. The urinalysis here served a purpose recognized as valid by the Court of Military Appeals; namely, "the special interest of the military in ferreting out illegal drugs and protecting the health and fitness of its members." *Johnston*, 24 M.J. at 274 (citing *Murray v. Haldeman*, 16 M.J. 74 (C.M. A.1983)).

The manner in which the biochemical testing was conducted in this case also met all the requirements for a lawful inspection, and the results of such testing were therefore admissible under Mil.R.Evid. 313(b). The appellee was not subjected to a substantially different intrusion during the inspection process. His sample, so far as we can tell from the record, was taken and processed through the prescreening in the same manner as all the other samples taken at that time. It was only after appellee's sample showed the presence of THC that it was selected for further testing at the laboratory at Fort Meade. Mr. Christman's action in this regard was motivated by several factors: The prescreening equipment has a greater margin of error than the equipment used at the main laboratories; appellee's sample came very close to being identified as a "positive" during the pre-screening process (100 nanograms per milliliter was the cut-off, appellee's sample contained 93.5 nanograms per milliliter); Mr. Christman was "confident" that, due to the more accurate equipment used at Fort Meade, appellee's sample would ultimately test positive for the presence of the marijuana metabolite; [5] and the continuing need to ensure proper quality control by providing feedback to him concerning the accuracy of the prescreening equipment and the reliability of his prescreening process.

█ There is no evidence that Mr. Christman singled out appellee's sample for further testing for the purpose of court-martial prosecution or other disciplinary action, or that he in any way acted outside the scope of the commander's authorization for the inspection. To the contrary, Mr. Christman's motivation appears entirely consistent with the intent of the biochemical testing program as outlined in AR 600–85 and its provisions pertaining to prescreening and quality control. We further conclude that there was no violation of any reasonable expectation of privacy on the part of appellee. The appellee, at the time he submitted the urine sample, was fully aware that the sample would be tested for the presence of illicit drugs, including marijuana. This is common knowledge in the Army today. Further, the mere fact that his sample contained slightly less than the nanogram level required to be labeled "positive" during the prescreening did not vest appellee with a reasonable expectation that the sample would not be further tested, given the provisions of AR 600–85 and the facts and circumstances of this case.

We hold that Mr. Christman's decision to forward appellee's urine sample to Fort Meade did not convert the inspection to an

---

**5.** All samples which arrive at the Fort Meade drug testing facility, regardless of prescreening status, must undergo an RIA test. Dep't of Defense Directive 1010.1, Drug Abuse Testing Program, Enclosure 3–1 (Dec. 28, 1984). Like the field prescreening test, the cut-off level for THC is 100 nanograms per milliliter. Memorandum for the Assistant Secretary of the Army (M & RA), Subject: Transportation and Retesting Levels (23 Apr. 1985). Thus, while the RIA test may be more accurate than field test methods, it subjects samples to no greater scrutiny than those latter methods in terms of the nature or quantity of substances for which the samples are tested. *See* Mil.R.Evid. 313(b).

unauthorized search conducted without proper authorization, it was instead part of a permissible inspection under the fourth amendment. The evidence obtained from the inspection is therefore admissible. Accordingly, the appeal of the United States is granted. The ruling of the military judge suppressing the results of the urinalysis is vacated. The record will be returned to the military judge for action not inconsistent with this opinion.

Senior Judge MYERS and Judge JOHNSON concur.