UNITED STATES, Appellee,

v.

Brian T. KONIECZKA, Staff Sergeant,
U.S. Army, Appellant.

Misc. No. 90–16.
ACMR Misc. No. 9000001.

U.S. Court of Military Appeals.

Argued July 31, 1990.
Decided Sept. 28, 1990.

For Appellant: *Major Michael J. Kelleher* (argued); *Colonel Robert B. Kirby,*

Lieutenant Colonel Russell S. Estey, Captain W. Renn Gade, Captain Andrew G. Oosterbaan (on brief).

For Appellee: *Major Martin D. Carpenter* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto* (on brief).

## Opinion of the Court

SULLIVAN, Judge:

On November 21, 1989, appellant was arraigned before a military judge sitting alone as a special court-martial at Fort Lee, Virginia, on a single specification of wrongful use of marijuana, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Before entry of pleas, the military judge granted appellant's motion to suppress evidence derived from the testing of his urine specimen. Government counsel filed an appeal under Article 62, UCMJ, 10 USC § 862, challenging the military judge's ruling. The Court of Military Review granted this appeal and vacated the military judge's ruling. 30 MJ 752 (1990).

This Court granted review of the following issue:

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW IN VACATING A RULING BY THE MILITARY JUDGE THAT AN ANALYSIS OF APPELLANT'S URINE SPECIMEN WAS AN UNLAWFUL SEARCH WHERE THE SPECIMEN WAS TAKEN AS PART OF A UNIT INSPECTION, PRE-TESTED NEGATIVE, AND WAS INDIVIDUALLY SUBJECTED TO FURTHER TESTING AT THE DISCRETION OF A GOVERNMENT AGENT.

We hold that the Court of Military Review erred as a matter of law in reversing the judge's suppression ruling. *See United States v. Johnston*, 24 MJ 271, 275 (CMA 1987); Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1984.[1] *See*

---

1. Mil.R.Evid. 313 is set out verbatim below:

Rule 313. Inspections and Inventories in the Armed Forces

(*a*) *General rule.* Evidence obtained from inspections and inventories in the armed forces conducted in accordance with this rule is admissible at trial when relevant and not otherwise inadmissible under these rules.

(*b*) *Inspections.* An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. *An inspection also includes an examination to locate and confiscate* unlawful weapons and *other contraband. An order to produce body fluids, such as urine, is permissible in accordance with this rule. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of* this rule. *If a purpose of an examination is to locate weapons or contraband, and if:* (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, *the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule. Inspections shall be conducted in a reasonable fashion* and shall comply with Mil.R.Evid. 312, if applicable. Inspections may utilize any reasonable natural or technological aid and may be conducted with or without notice to those inspected. Unlawful weapons, contraband, or other evidence of crime located during an inspection may seized.

(*c*) *Inventories.* Unlawful weapons, contraband, or other evidence of crime discovered in the process of an inventory, the primary purpose of which is administrative in nature, may be seized. Inventories shall be conducted in a reasonable fashion and shall comply with Mil.R.Evid. 312, if applicable. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inventory within the meaning of this rule.

(Emphasis added.)

*generally United States v. Vangelisti,* 30 MJ 234 (CMA 1990).

The facts of this case are derived from the record of trial, the judge's special findings (see Appendix), and the opinion of the court below. Appellant participated in a unit urinalysis on April 17, 1989. These samples were sent to Mr. Karl Christman, the installation Alcohol and Drug Control Officer, who subsequently pretested or prescreened the specimens, including appellant's. Appellant's sample tested negative.

Mr. Christman testified on the motion to suppress about his subsequent action with these pretested specimens:

MJ: Say the—your cutoff prescreen for marijuana is a hundred nanograms, is that correct?

A: Correct.

Q: Okay. Say it shows 60 nanograms. Are you going to forward that sample to the lab?

A: I probably will.

Q: All of them? All of them that come back showing less than prescreening cutoff level?

A: *There are a number of different occasions where I may and I may not.* If this is an individual who shows 60 nanograms for the first time on a unit urinalysis, I'm going to send it.

   \*    \*    \*    \*    \*    \*

Q: Do you remember—forwarding the drug sample in this case, in Sergeant Konieczka's case?

A: Extremely well. I do recall this.

Q: Well what was your purpose in selecting and forwarding his sample?

A: *It had 93.5 nanograms on my machine and I was very confident that that one would come back confirmed.* I know that the laboratories confirm at 15 nanograms and so if it—I forwarded it thinking that if it got past the RIA at the forensic lab it indeed would be confirmed. *I only put an "N" on a chain of custody because as long as it's under the 100 on my machine I can't call it positive* and this is a normal—I do this in the regular course of business all the time.

(Emphasis added.)

Having the benefit of briefs and argument of counsel, and having heard Mr. Christman's testimony, the military judge stated the following and entered special findings:

> I tried to read as many of the cases cited by counsel for both sides. Some I'm not familiar with. First let me say that the briefs of counsel were to the point, were well written and very helpful in reaching the decision that the Court has reached. I looked at several things. Of course I paid attention to the testimony of Mr. Christman or I would not have called him as a witness here. I also looked carefully at the provisions of AR 600–85 and the cases in argument cited by counsel for both sides. Let me say first that based upon the facts as they were laid out, I have no doubt that the accused used marijuana. That's not the issue here. The issue here is what happened in the collection and analysis of the

sample. Initially I'm drawn to AR 600–85 because that's the controlling regulation and in analyzing the regulation the Court clearly finds that the purpose of the regulation—as simply stated by counsel for both sides—is quality control. That is, the submission of prescreened negative samples is quality control. No doubt about that. *It's also clear that the regulation mandates that such prescreening negative samples be randomly selected. In this case they clearly were not*—in the accused's case. Mr. Christman stated and it was brought forth in the briefs by counsel that the accused's sample was selected because he thought it might test positive. *Mr. Christman apparently do [sic] not have any clear set policy on forwarding samples that show trace amounts to the laboratory; that it's what he felt, what he thought, what he wanted to, in essence.* That's unacceptable. Rule 313 clearly states—313b that is—clearly states in part that the purpose of the examinations to locate weapons or contraband and specific individuals are selected for an examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this Rule. *It was not an inspection within the meaning of this Rule is the ruling of this Court. That once the test of the prescreen sample had tested negative, the selection, specifically of the accused's sample over and above others in a nonrandom basis, converted it to a search, a search for which there was no probable cause in this case.* It's unfortunate but in this case the demise to the use of this urine sample in a court-martial procedure did not have to happen. *If there was a set policy that governs these things, and is not left to the whim of the Installation Drug Coordinator as to which prescreened samples with trace amounts in them went to the lab, a different result might have resulted or come of this case,* however, it didn't. Further, findings of fact, which were included to the law [sic] will be submitted upon the authentication of the record in this case but suffice it to say that it is with great reluctance that I must grant the defense Motion in this case. Now, Captain Casalnova, do you want your three days in this case?

(Emphasis added.)

In reaching a conclusion contrary to the military judge's suppression ruling, the Court of Military Review stated, in relevant part:

> There is no requirement [under Army Regulation 600–85] that the [quality control] selections be made on a random basis. The purpose of forwarding negative samples is to insure that the urine prescreening is being properly conducted.

> We thus conclude that Mr. Christman acted within his authority under the provisions of AR 600- 85 in selecting appell[ant]'s urine sample for forwarding to Fort Meade for testing. However, we must still determine whether Mr. Christman's decision to select appell[ant]'s sample converted a legitimate inspection into an unauthorized search conducted in violation of the fourth amendment.

30 MJ at 755. The court then went on to conclude that the primary purpose of the unit urinalysis inspection was valid, that the inspection was conducted in an appropriate manner, and that there was "no evidence that Mr. Christman singled out ap-

pell[ant]'s sample for further testing for the purpose of court-martial prosecution or other disciplinary action...." The court below held

> that Mr. Christman's decision to forward appell[ant]'s urine sample to Fort Meade did not convert the inspection to an unauthorized search conducted without proper authorization, it was instead part of a permissible inspection under the fourth amendment. The evidence obtained from the inspection is therefore admissible.

*Id.* at 756–57.

---

The question before us is whether the Court of Military Review erred as a matter of law in reversing the judge's suppression ruling. *See generally United States v. Abell,* 23 MJ 99, 102 (CMA 1986). The question before the Court of Military Review was whether the judge erred as a matter of law in granting the defense motion to suppress the results of the urinalysis. Art. 62; *see United States v. Vangelisti, supra* at 237. The judge found that Mr. Christman's conduct in forwarding appellant's urine specimen for additional testing at the drug laboratory violated applicable service regulations which required random selection of forwarded negative prescreened samples. He also found that such conduct, in the context of other evidence in this case, raised questions whether this inspection was a mere subterfuge for a search. *See generally United States v. Johnston,* 24 MJ 271 (CMA 1987). *Cf. United States v. Pollard,* 27 MJ 376 (CMA 1989).[2] He then concluded that the prosecution did not show by clear and convincing evidence that this government action was a valid inspection. Mil.R.Evid. 313(b).

Our starting point in this case is Department of Defense Directive 1010.1 (Dec. 28,

1984), which states in paragraph E 1 b: "Although the DoD drug testing program is designed for specific administrative purposes, the use of urinalysis results in disciplinary or administrative proceedings is permitted, except as otherwise limited in the Military Rules of Evidence, this Directive, or rules issued by the Department of Defense or the Military Departments." Paragraphs E 2 e and E 4 of this same Directive permit field testing, as distinguished from laboratory testing, of urine samples in accordance with enclosure 5. Enclosure 3 of this same regulation states in Section I, *Disposition of Specimens:* "1. If the result of a test is negative, the specimen shall be discarded *unless it is to be retained for quality control purposes under procedures established by the Military Department concerned.*" (Emphasis added.) Enclosure 5 of this Directive does not specifically address whether negative prescreen samples may be forwarded to the laboratory for further testing or under what conditions this action may be taken.

AR 600–85 (21 Oct.1988) speaks directly to the prescreening process. It says in Section 10–7:

10–7. Urine drug prescreening (field testing)

*a. Overview.* The primary means of testing urine specimens is through a DOD certified laboratory. The use of DOD and DA approved portable and nonportable drug detection systems to prescreen urine specimens at the installation is an acceptable means for making a preliminary determination regarding the absence or presence of drug metabolite in a urine specimen. *Except* for negative specimens submitted for internal quality control in accord with paragraph F–3a(4), negative specimens may be discarded. Positive specimens must be immediately

---

2. This case is different from *United States v. Pollard,* 27 MJ 376 (CMA 1989), because those regulatory violations were not accompanied by other evidence which raised the possibility that the urine examination in that case was a subterfuge for a search. *Id.* at 377 n.3.

forwarded to an FTDTL or Army contract laboratory for testing.

*b. Policy*

(1) *All prescreening must be accomplished under chain of custody as outlined in appendix E and follow operational procedures as outlined in appendix F.*

(2) Installations and activities conducting prescreening must have trained and certified equipment operators and a quality control program at the installation. They also must participate in a quality control (QC) program that is external to the installation. The external QC program will be managed by USADAOA and coordinated through the appropriate MACOM ADCO.

(3) Operator training and certification is an installation responsibility, to include arrangement for the training that has been approved by HQDA and programming for the cost of the training.

(4) Positive prescreening results are preliminary until confirmed as positive by an FTDTL or an Army contract drug testing laboratory or by admission of drug use by the service member.

(5) Prior to receipt of the confirmatory testing results from a drug testing laboratory, or by an admission by the service member, commanders may use positive prescreening results only for the following purposes:

(*a*) Referral to the ADAPCP Community Counseling Center for screening.

(*b*) Temporary transfer, removal, or suspension from duty of personnel serving in sensitive duty positions or in positions where drug abuse presents an immediate danger to the safety, health, or welfare of others.

(*c*) Temporary suspension of access to classified information.

(6) If the prescreened positive result is not confirmed as positive by an FTDTL or Army contract drug testing laboratory or an admission by the service member—

(*a*) The results may not be used to take further adverse administrative or disciplinary action.

(*b*) Any temporary action based upon the prescreening results shall be rescinded.

(7) To the *extent* an action is based upon evidence other than the prescreening result, nothing in *b* (1) through (6) above precludes continuation of temporary or other appropriate action.

(Emphasis added.)

Appendix E to this regulation, entitled *Standard Operating Procedures for Chain of Custody for Commander–Directed Urinalysis,* specifically addresses the prescreening process at the command level. It states in pertinent part:

E–14. If the urine specimens are to be prescreened, the following procedures apply:

\*    \*    \*    \*    \*    \*

*d. As a quality control measure, the IBTC will randomly submit a minimum of 2 percent (not to exceed 10 percent) of prescreened negative specimens to the drug testing laboratory for quality control testing.*

*e. Other prescreened negatives may be discarded.*

(Emphasis added.)

Appendix F of this same regulation provides:

F–3. Quality assurance

Quality assurance will consist of both internal and external procedures to assure that urine prescreening is properly conducted.

a. *Internal.*

\* \* \* \* \* \*

(3) The ADCO and IBTC will closely monitor confirmation results on prescreened positive specimens. As a minimum, 80 percent of positive prescreened specimens should be confirmed when laboratory confirmation is accomplished by Gas Chromatography/Mass Spectrometry. Upon failure to meet the 80 percent minimum, the ADCO will immediately notify USADAOA through the MACOM. Prescreening will be suspended until the problem is identified and corrected.

(4) *The IBTC will submit a minimum of 2 percent of prescreened negative specimens (not to exceed 10 percent) to an FTDTL or contract laboratory as an additional internal quality control check. These specimens must be selected by the IBTC and not the equipment operator.*

(Emphasis added.)

■ Our initial problem with the opinion below is its total disregard of paragraph E–14d of Appendix E to AR 600–85. This provision requires that selection "of prescreened negative specimens" for forwarding by the command to the laboratory be done "randomly." It formed the regulatory predicate for the judge's suppression ruling and was expressly noted in both briefs before the court below. The Court

of Military Review's exclusive reliance on paragraph F–3a(4) to find no requirement for random selection of prescreened negative testing in this context is not explained. On the basis of the entire regulation, we conclude that Mr. Christman exceeded his authority under AR 600–85 in sending appellant's negative urine specimen to the laboratory for further testing. *See also* Section 10–8, AR 600–85, *supra.*[3] *See generally United States v. Arguello,* 29 MJ 198 (CMA 1989).

■ Our second problem in this case is with the comment in the opinion below that appellant "was not subjected to a substantially different intrusion during the inspection process." 30 MJ at 756. *See* Mil.R. Evid. 313(b). The opinion suggests in footnote 5 (*id.*) that the greater accuracy of the test at the laboratory does not expose the sample to "greater scrutiny" than the field test which both have a "cut-off level for THC" (*see* 30 MJ at 753) of 100 nanograms. This broad conclusion we find unpersuasive as a matter of law. *See Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct 1402, 1412–13, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 1394 n.2, 103 L.Ed.2d 685 (1989). Indeed, we hold this question was primarily one of fact in which the judge, the appropriate factfinder in this case, took a position which the Court of Military Review disagreed with. We see no legal error in his contrary conclusion. *Cf. United States v. Johnston,* 24 MJ at 275.

Our third problem with the opinion below is its assessment of the propriety of Mr.

---

**3.** Paragraph 10–8 of AR 600–85 provides:

    a. Urine specimens may be retested, providing a sufficient quantity of the specimen is available to permit retesting. All requests for a retest will be in writing. Retesting will be accomplished as follows:

    (1) Upon request of the submitting installation/command, the soldier, or the attorney representing the service member. All re-

quests must be forwarded through the submitting installation/command to the Army/Air Force laboratory performing the initial test, or through USADAOA in the case of contract laboratories.

    (2) Upon request of an administrative board under rules applicable to the board.

    (3) Upon order of a court-martial or rules applicable to the court-martial.

Christman's motivation in forwarding appellant's prescreened negative specimen for further testing. *See* Mil.R.Evid. 313(b). It said: .

> There is no evidence that Mr. Christman singled out appell[ant]'s sample for further testing for the purpose of court-martial prosecution or other disciplinary action, or that he in any way acted outside the scope of the commander's authorization for the inspection. To the contrary, Mr. Christman's motivation appears entirely consistent with the intent of the biochemical testing program as outlined in AR 600–85 and its provisions pertaining to prescreening and quality control.

30 MJ at 756. This conclusion is erroneous for several reasons.

First, as noted earlier, Mr. Christman testified that he sent appellant's sample forward for additional testing because he suspected it would be confirmed as positive. Then the following occurred:

Q. When you want to take a sample that has trace amounts, in your decision-making process to forward it to the laboratory, don't you also consider the likelihood that it will confirm positive when you send it up?

MJ: Go ahead, Mr. Christman. I think you already mentioned that.
[WIT] Yes.

[MJ] Okay. For instance, if one—for example—I'm sorry—the cutoff level for cocaine on your prescreening machine is 300 nanograms?

A. That's correct.

Q. Okay. And if you had a sample that prescreened at, say 70 nanograms for cocaine metabolite, you would send it

to the lab because it would have a chance of turning positive.

A. I might send it to the lab and I might not. If it was—*if I had reason to believe that the person could possible be positive for other—other laboratories do test for other drugs—I would send it.*

Q. *So based on the belief that if they may be positive for other drugs you may send it to the lab as well for further testing.*

A. *That's correct.*

(Emphasis added.)

It is clear that the forwarding of the negative sample was accomplished on the basis of the installation administrator's suspicion that the sample would test positive. Moreover, it was established that this action was not done for purposes of quality control as Mr. Christman selected nine other samples for this purpose on a random basis. Finally, while it was not clear whether he intended to secure a positive test result for purposes of prosecution or counseling, such result would not be privileged, so it could lead to prosecution of the servicemember. *Cf.* para. 5–5*d*, AR 600–85; *see* para. 10–2(c), AR 600–85. In these circumstances, we conclude the military judge was correct in holding that Mil.R. Evid. 313(b) requires the Government to meet its burden to show this examination was a valid inspection under this rule.

■ Our final problem in this case is with the Court of Military Review's conclusion that the forwarding of appellant's negative prescreened urine and its additional testing was a reasonable inspection whether specifically authorized or not. *See generally Skinner v. Railway Labor Execu-*

---

b. A soldier may obtain a retest at a forensic laboratory outside the DOD laboratory system at the service member's own expense

when a sufficient quantity of the same specimen is available to permit retesting.

*tive Association,* 109 S.Ct. at 1422. It relies primarily on the decision of this Court in *United States v. Ellis,* 24 MJ 370 (1987). In that case, this Court referenced the implied authorization doctrine of *United States v. Jasper,* 20 MJ 112 (CMA 1985), which focused on the purpose of the inspection authorized by the commander. However, in both these cases, there was no hint in the record that the inspection was a subterfuge for an illegal search. *Id.* at 114; *United States v. Ellis, supra* at 372 n.2.

■ We again note that the judge's finding that Mr. Christman's conduct was not authorized by service regulations was legally sound. This was strong evidence of unreasonableness. Even assuming the appropriate regulations permitted unlimited or standardless discretion to Mr. Christman concerning the decision for additional and more accurate testing, serious constitutional problems would be raised. *See Florida v. Wells,* —— U.S. ——, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990); *Skinner v. Railway Labor Executive Association, supra* at 1422. This is particularly true where the person exercising this discretion does so on the basis of suspicion of evidence of criminal activity. *Colorado v. Bertine,* 479 U.S. 367, 375, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987); *United States v. Johnston, supra* at 275. We find no legal error in the judge's conclusion that the examination of appellant's urine in these circumstances was not shown by the prosecution to be a valid and reasonable inspection under Mil.R.Evid. 313(b).[4] Thus, the Court of Military Review committed legal error in overruling his decision.

The decision of the United States Army Court of Military Review overruling the

motion to suppress is reversed. The military judge's ruling is reinstated.

Chief Judge EVERETT concurs.

APPENDIX

1. On 21 November 1989, court was convened in the above entitled case at Fort Lee, VA. The defense made a motion to suppress the results of the urinalysis which was held on 17 April 1989. The basis of the motion was that the results were obtained in violation of MRE 313(b) and para. E–14(d), AR 600–85.

2. The essential facts were not in dispute by either side. Essentially, there was no question as to the chain of custody for the urinalysis. What had happened was that the accused's sample was pre-screened and was, under the relevant standards deemed to be negative. However, the pre-screening did reveal the presence of the THC metabolite but less than the required 100 nanograms required for forwarding the sample for confirmatory testing at the Fort Meade drug testing laboratory. The installation alcohol and drug control officer, Mr. Karl Christman, as a part of the pre-screening procedure, was required to randomly select not less than 2% nor more than 10% of the pre-screened negative samples and forward them for testing as a quality control measure for the pre-screening procedure. However, Mr. Christman did not select the accused's urine sample on a random basis. He selected it because it had pre-screened at 93.5 nanograms and he thought that the lab might find it to be positive. (R. 28–29) Further, it was readily apparent from the testimony of Mr. Christman that his selection of pre-screened negative urine samples was not on a purely random basis nor was it a quality control measure. (R. 27–29)

**4.** Appellant may not have standing to challenge a mere technical violation of government regulations designed to promote governmental interests. *See generally United States v. Carceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). However, evidence that the administrators of the scheme departed from regulations to gather

evidence of criminal-law violations changes the nature of the claim and appellant's standing to object to this government action. *See Skinner v. Railway Labor Executive Association,* 489 U.S. 602, 109 S.Ct. 1402, 1415 n. 5, 103 L.Ed.2d 639 (1989), and Mil.R.Evid. 313(b); *United States v. Johnston,* 24 MJ 271 (CMA 1987).

3. FINDINGS OF FACT AND CON-
CLUSIONS OF LAW:

A. That the actions of Mr. Christman extended the alleged inspection to specific individuals within the meaning of MRE 313(b).

B. That, as a result of the alleged inspection having been extended to specific individual(s), the burden was on the prosecution to establish by clear and convincing evidence that the examination was an inspection within the meaning of MRE 313.

C. That the government failed to establish by clear and convincing evidence that the actions of Mr. Christman were in the furtherance of a valid inspection in that:

1.) That, while Mr. Christman may have had suspicion that the accused's urine sample did contain THC, his actions were not in the furtherance of valid inspections within the meaning of MRE 313.

2.) That Mr. Christman, by forwarding the urine sample to confirm what were to his suspicions, blatantly violated the mandate of AR 600–85 which required random selection as a "quality control" measure.

3.) That Mr. Christman's actions amounted to subjecting the accused to a greater degree of scrutiny for which there was no basis in law or regulation.

4.) That Mr. Christman's actions in submitting the accused's urine sample for further testing amounted to a "search" within the meaning of the 4th Amendment for which there was no probable cause.

5.) That the argument of the government that, since they were in possession of the accuseds urine sample through a valid inspection, they could subject it to whatever tests deemed appropriate is not correct in light of the fact that the accused's sample was subjected to a greater intrusion than other's who may have shown traces of THC but yet pre-screened "negative."

6.) That government counsel's argument that the regulation in question did not create any "privacy" rights and that, as a result there are no 4th Amendment implications, is misplaced. The Government itself established the standards by which pre-screened negative samples were to be forwarded to the lab for further testing, i.e., random sampling. Mr. Christman violated that standard when he arbitrarily selected the accused['s] sample because he felt that it might test positive at the lab which, it might be added, had a lower positive threshold than the pre-screening. An individual has a "privacy" right against any arbitrary or unreasonable Government intrusion which places him at greater risk than others without sufficient justification or excuse. The privacy right is not limited to his person or perhaps even his exclusive use areas, i.e., his house. Privacy within the meaning of the 4th Amendment means more.

COX, Judge (dissenting):

The issue for this Court is whether appellant's urine was seized as a part of a lawful inspection under Mil.R.Evid. 313(b) or whether it was an illegal search under the Fourth Amendment to the Constitution. I take it there is no contention that the officer ordering the unit urinalysis had anything other than a proper military inspection in mind. Therefore, the controversy is focused on the after-the-fact handling of appellant's urine sample by Mr. Christman, the installation drug-control officer.

To begin, I agree with the majority that Mr. Christman did not "randomly" select appellant's urine to be forwarded for "qual-

ity control." Thus, I agree that the letter of AR 600–85 was violated. The question is, does this violation give rise to an exclusionary rule? The majority says it does; I disagree, for these reasons:

One, in order to suppress evidence seized, an accused must have a legitimate expectation of privacy in the property. *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In this regard, I agree entirely with the conclusion of the Court of Military Review herein:

> The appellee, at the time he submitted the urine sample, was fully aware that the sample would be tested for the presence of illicit drugs, including marijuana. This is common knowledge in the Army today. Further, the mere fact that his sample contained slightly less than the nanogram level required to be labeled "positive" during the prescreening did not vest appellee with a reasonable expectation that the sample would not be further tested, given the provisions of AR 600–85 and the facts and circumstances of this case.

30 MJ 752, 756 (1990).

The invasion of appellant's privacy rights occurred, if at all, at the time the urine was seized. We have long since sanctioned the legitimacy of such intrusions. *United States v. Bickel,* 30 MJ 277 (CMA 1990); *Murray v. Haldeman,* 16 MJ 74 (CMA 1983). If appellant had no viable expectation of privacy in his urine sample when he provided it, I am at a loss to understand how he acquired it once it entered analysis channels.

Two, agency violations of their own regulations do not *ipso facto* create exclusionary rules. As the Supreme Court noted:

> In view of our conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.

*United States v. Caceres,* 440 U.S. 741, 754–55, 99 S.Ct. 1465, 1472–73, 59 L.Ed.2d 733 (1979) (footnote omitted). *See also United States v. Pollard,* 27 MJ 376 (CMA 1989).

It should be perfectly obvious that installation prescreening was not established to confer rights on servicemembers. The fact is that the more sophisticated tests, conducted at the laboratories, are considerably more expensive. Thus, prescreening is necessitated to protect the *taxpayer.* With the exception of the few "quality control" specimens, only those samples deemed most likely to prove positive are forwarded to the laboratory.

To illustrate the point, if scientifically unassailable tests could be administered more cheaply, such that *all* urinalyses were routinely subjected to the highest possible test, appellant could hardly complain. Therefore, the fact that the armed forces have decided to conserve scarce resources and send only the most likely samples forward does not enlarge appellant's privacy rights. In my opinion, Mr. Christman's nonrandom selection of appellant's specimen for "quality control" purposes gives appellant no grounds to have the results suppressed.

I am sympathetic with the majority's concern for the credibility of the urinalysis program. Our concern as a court, however, should be confined to whether the evidence seized violates a servicemember's rights under the Fourth Amendment. I

leave it to the proponent of the regulation to determine whether his subordinates are administering the regulation as intended.

For these reasons, I would affirm the decision of the United States Army Court of Military Review.