**UNITED STATES, Appellee**

v.

**Keith W. CAMPBELL, Sergeant
U.S. Army, Appellant.**

**No. 93–0277/AR.
CMR No. 9102318.**

U.S. Court of Military Appeals.

Argued Jan. 4, 1994.

Decided Sept. 30, 1994.

Military Justice, 10 USC §§ 886, 892, and 934, respectively. Contrary to his pleas, he was found guilty of wrongful use of cocaine, in violation of Article 112a, UCMJ, 10 USC § 912a. He was sentenced to a bad-conduct discharge, confinement for 18 months, total forfeitures, and reduction to Private E1. On February 24, 1992, the convening authority approved the sentence as adjudged. On September 30, 1992, the Court of Military Review affirmed these findings of guilty and the sentence.

On May 4, 1993, this Court granted appellant's petition for grant of review on the following issues:

## I

WHETHER THE EVIDENCE IS SUFFICIENT AS A MATTER OF LAW TO FIND APPELLANT GUILTY OF WRONGFUL USE OF COCAINE.

## II

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING THE RESULTS OF APPELLANT'S URINALYSIS OVER DEFENSE OBJECTION.

We hold that appellant's positive urinalysis test results and his subsequent confessions were improperly admitted in evidence at his court-martial. Mil.R.Evid. 311(a) and (e)(2), Manual for Courts–Martial, United States (1984); *United States v. Johnston*, 24 MJ 271 (CMA 1987); *United States v. Kaliski*, 37 MJ 105 (CMA 1993). Furthermore, we hold that appellant was prejudiced by admission of this evidence with respect to his conviction for wrongful use of cocaine. Mil.R.Evid. 103(a). *See generally Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

For Appellant: *Captain Victor A. Tall* (argued); *Colonel Malcolm H. Squires, Jr. and Captain Robin N. Swope* (on brief); *Captain Clayton R. Diedrichs.*

For Appellee: *Major Joseph C. Swetnam* (argued); *Colonel Dayton M. Cramer, Major James L. Pohl, Captain Robert J. Walters* (on brief).

*Opinion of the Court*

SULLIVAN, Chief Judge:

In October of 1991, appellant was tried by a military judge sitting alone as a general court-martial at Fort Bragg, North Carolina. Pursuant to his pleas, he was found guilty of absence without leave (6 days), violating a lawful general regulation (3 specifications), and dishonorable failure to maintain sufficient funds (18 specifications), in violation of Articles 86, 92, and 134, Uniform Code of

The military judge in this case held an evidentiary hearing on a defense motion to suppress government evidence of appellant's positive urinalysis test and his subsequent confessions. Art. 39(a), UCMJ, 10 USC § 839(a). Defense counsel made the following argument:

The urinalysis in question, sir, was ordered on the 15th. The primary factor

behind this urinalysis was the first sergeant, First Sergeant Sharp of Alpha Company.

First Sergeant Sharp hears rumors of suspected drug use in the company. He has no other concrete facts, but he does hear rumors. He eventually boils it down to that it is someone or some people in either Headquarters Platoon or 1st Platoon. The first [s]ergeant then takes a look at both platoons, hand-picks those people who he wants to be tested. He does this partially based upon who somebody would have associated with. For instance, somebody in Headquarters Platoon who hangs out with somebody in 1st Platoon would then become, in the first sergeant's eyes, a suspect. He then compiles this list of twelve, fifteen suspects, gives it to the Company Commander, Captain Bangs, and then the test is ordered.

*There's no independent basis for probable cause.* My interviews with the first sergeant reveal that he did not suspect Sergeant Campbell at all of being involved in drugs. *But still, the way he selected this list is a subterfuge. It certainly was an invalid inspection.* On the fact that it's coming on the heel of rumors makes it highly suspect, Your Honor, and I think it should be suppressed.

(Emphasis added.)

The military judge then prompted defense counsel to state the specific grounds for the defense motion to suppress:

MJ: So, based upon your motion to suppress, your written motion to suppress, and what you've represented here in court today, the basis of your motion is—am I correct-that the urinalysis test that the accused was subjected to on the 15th of May, was not a valid military inspection?

DC: Yes, sir.

MJ: Under M.R.E. [Mil.R.Evid.] 313?

DC: Yes, sir.

MJ: And it was not because it was just a subterfuge for an illegal search.

DC: Yes, sir.

MJ: And it was just a subterfuge because the first sergeant just heard these generalized rumors.

DC: Yes, sir, involving unknown members of certain platoons. Rather than testing Headquarters Platoon entirely or 1st Platoon entirely, he subjectively starts to compile a list of those people who he feels should be tested.

MJ: And it's your further contention then that but for the positive urinalysis test, the accused would never have landed in the CID [Criminal Investigation Command] office on the 5th and 6th of June and would never have rendered statements which were incriminating.

DC: Yes, sir.

MJ: All right, Captain Didier, that's the ground upon which you have to—that's the field of battle, if you will. So, it's now your ball game.

Trial counsel then offered an opening statement:

TC: Your Honor, before I call my first witness, if I may just make a few points on the record.

MJ: Sure.

TC: And that is, yes, we are dealing with a 4th Amendment search here. However, we are also dealing with not magistrates nor law enforcement agencies nor lawyers, we're talking about a command that was trying to be responsive to what was perceived to be a realistic and on going drug problem within the unit. Therefore, we're talking about a more reasonable standard under the 4th Amendment. We're talking about, good faith when *the first sergeant submitted his list to his company commander based on what he thought was probable cause. That, I hope to elicit through the testimony of the company's first sergeant, First Sergeant Sharp. However, be that as it may, if the court finds that there was not probable cause for that particular urinalysis, there are other doctrines which would make the subsequent confessions to CID by the accused admissible. Those are the inevitable*

*discovery rule, and again, the good faith exception.*

The Government's burden of proving the evidence was not obtained—excuse me, that these confessions were not obtained as the result of an unlawful search, is a mere preponderance of the evidence. For that, the government cites [Mil. R.Evid.] 311(e)(1) and (2).

(Emphasis added.) Later he impliedly suggested that the challenged urinalysis might be upheld as a valid inspection under Mil. R.Evid. 313(b).

As its first witness, and the only witness to testify to the circumstances leading to the command-directed urinalysis, the prosecution called appellant's first sergeant, First Sergeant (1SG) Sharp. 1SG Sharp testified that "there were rumors that there were drugs being used, consumed and distributed within the barracks." He further testified that he had been specifically informed by one soldier in his command, Sergeant (SGT) Rouse, that the drug problem was in the Headquarters and 1st Platoons. 1SG Sharp testified, "I was looking at every soldier in the headquarters element and trying to figure out who was actually dealing with guys in the 1st Platoon or what guys in the 1st Platoon were interacting with guys in Headquarters Platoon." 1SG Sharp stated that appellant associated with a soldier, SGT Anderson, who "had previously come up hot" on a urinalysis. Prior to appellant's urinalysis, 1SG Sharp observed appellant in the presence of SGT Anderson, and he characterized their presence in the barracks area as "suspicious." Finally, when asked by trial counsel if he had "probable cause to conduct the urinalysis," 1SG Sharp responded, "Yes, sir. The indication was that we already had a guy that came up positive on a urinalysis and that my concern was the health and welfare of the soldiers that are in the unit."

During questioning by the military judge, 1SG Sharp testified that he had specifically asked SGT Rouse to identify those soldiers who SGT Rouse knew were using drugs. 1SG Sharp told the military judge that when SGT Rouse declined to provide that information, 1SG Sharp stated to SGT Rouse, "Just kind of give me an idea of which platoon I should be looking at." Prior to questioning SGT Rouse, 1SG Sharp "read him his rights so there wouldn't be any violation of his rights, and began to ask him questions." The first sergeant also questioned another soldier, Private First Class (PFC) Gochenaur, after reading him his rights. The first sergeant decided to take PFC Gochenaur's name off the list because he was personally "satisfied" with PFC Gochenaur's answers during the interview. Finally, when asked by the military judge who ordered the urinalysis, 1SG Sharp responded, "The company commander, sir. I advised him. He directed it."

The military judge denied the defense motion to suppress the results of the urinalysis and any evidence derived from that scientific test. He made the following findings regarding the command-directed urinalysis:

First, that one of the purposes of the first sergeant and the CO [commanding officer] in conducting a urinalysis in this case, was to locate and detect contraband in the form of illegal drugs in the unit.

Secondly, that in the process of conducting this urinalysis, there were two elements in the unit in which illegal drug activity was reasonably suspected to be occurring and these two elements, Headquarters and 1st Platoon, consisted of about 52 soldiers, and of these 52 soldiers, about 20 or 38 percent were selected to undergo urinalysis. Though this is a substantial portion of those unit elements, nevertheless, specific individuals were selected for urinalysis, and thus, I believe the standard of proof that the Government must meet in this case of clear and convincing evidence is triggered, as opposed to preponderance of the evidence.

I further find that First Sergeant Sharp and the unit CO had a reasonable basis for believing that there was contraband in the form of illegal drugs in the unit. I find that on the date of the urinalysis in question, the CO and the first sergeant had no suspicion whatsoever that the accused was in any way involved with illegal drugs.

I also find that on the date of the urinalysis in question, neither the first sergeant or [sic] the CO were looking for any particular individual in the unit whom they suspected of involvement with illegal drugs, and I further find that they did not, in fact, suspect any particular individual, including the accused, as being involved with illegal drugs.

I also find that the accused was not selected out to be subjected to any increased examination or any closer scrutiny than anyone else required to undergo urinalysis.

I also find that the sole basis of the first sergeant for recommending and of the CO for directing that a health and welfare inspection urinalysis be conducted, was to ensure the unit was free of illegal contraband and to ensure that the unit was prepared to perform its mission.

Based on those findings—I also find that the urinalysis in question was not conducted following any report of any specific offense.

Therefore, *I find by clear and convincing evidence, that the urinalysis in question, the inspection in question in the form of a urinalysis was not a subterfuge for a search for criminal evidence, but rather was a valid health and welfare inspection to ensure that the unit was prepared to perform its mission by being free of illegal drugs.* Therefore, I deny the defense motion.

(Emphasis added.)

The Court of Military Review affirmed the decision of the judge below. It said:

The determination whether an inspection is for legitimate administrative decisions versus a search to discover evidence to be used in disciplinary proceedings is a factual question to be resolved by the military judge. *United States v. Barnett,* 18 MJ 166 (CMA 1984); *United States v. Austin,* 21 MJ 592 (ACMR 1985). Reviewing the military judge's findings of fact with our "awesome, plenary, de novo power of review" pursuant to Article 66, UCMJ, we find that the military judge correctly found that the government estab-

lished by clear and convincing evidence that the urinalysis was an inspection and not a subterfuge for a search. Accordingly, we hold that the results of the urinalysis was [sic] properly admitted at trial.

Unpub. op. at 3.

---

I

## INVALID INSPECTION

Mil.R.Evid. 313(b) provides, in pertinent part, that "an 'inspection' is an examination of the whole or part of a unit, ... conducted as an incident of command *the primary purpose of which* is to determine and to ensure the security, military fitness, or good order and discipline of the unit...." (Emphasis added.) It also states that "an order to produce body fluids, such as urine, is permissible in accordance with this rule." *See United States v. Daskam,* 31 MJ 77, 79 (CMA 1990) ("compulsory random urinalysis is within the scope of Mil.R.Evid 313's 'inspection' rationale"); *Murray v. Haldeman,* 16 MJ 74 (CMA 1983). Moreover, this Court, in construing Mil.R.Evid. 313(b), has generally held that, "[l]ike other lawful inspections, a urinalysis must be ordered for a legitimate purpose and be conducted in a lawful manner. *United States v. Middleton,* 10 MJ 123 (CMA 1981)." *United States v. Johnston,* 24 MJ 271, 274 (CMA 1987). In accord, Mil.R.Evid. 313(b) provides that a urinalysis conducted "for the primary purpose of obtaining evidence for use in a trial by court-martial" or in an "[un]reasonable fashion," is "not an inspection within the meaning of this rule." *See also New York v. Burger,* 482 U.S. 691, 716 n. 27, 107 S.Ct. 2636, 2651 n. 27, 96 L.Ed.2d 601 (1987).

■ Mil.R.Evid. 313(b) expressly permits inspections to "locate ... unlawful weapons and other contraband." However, if "specific individuals are selected for examination," Mil.R.Evid. 313(b) requires a showing "by clear and convincing evidence that the examination was an inspection" and not conducted for the primary purpose of "obtain[ing] a criminal conviction." *United States v. Bick-*

*el,* 30 MJ 277, 286 (CMA 1990). In *Bickel* this Court also stated

> that neither Mil.R.Evid. 313 nor the Fourth Amendment permits a military commander to pick and choose the members of his unit who will be tested for drugs and then to use the resulting evidence to obtain a criminal conviction. Instead, *the testing must be performed on a nondiscriminatory basis* pursuant to an established policy or guideline that will eliminate the opportunity for arbitrariness by the person performing the tests. *Cf. Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

30 MJ at 286 (emphasis added). Proof of selection based on standard criteria or routine practice is well recognized as clear and convincing evidence that the persons inspected were not principally chosen on the basis of suspicion of criminal activity amounting to less than probable cause. *See United States v. Konieczka,* 31 MJ 289, 291 (CMA 1990); *United States v. Johnston, supra* at 275; *cf. United States v. Flowers,* 26 MJ 463 (CMA 1988). *See generally Florida v. Wells,* 495 U.S. at 3–4, 110 S.Ct. at 1635; *Colorado v. Bertine,* 479 U.S. 367, 373, 375–76, 107 S.Ct. 738, 742, 742–43, 93 L.Ed.2d 739 (1987).

■ In the case *sub judice,* trial counsel conceded the weakness of his valid inspection argument, and we agree. There was no evidence whatsoever that 1SG Sharp[1] used anything but his suspicion of criminal activity to select appellant for this urinalysis test. *See Florida v. Wells, supra.* As noted above, 1SG Sharp testified that he began compiling a list of soldiers to be tested after SGT Rouse informed him of a "drug problem" in the Headquarters and 1st Platoons. Appellant was assigned to 1st Platoon. 1SG Sharp also had information that SGT Anderson, a soldier in Headquarters Platoon, had recently tested positive on a urinalysis. Furthermore, he testified that on one occasion he observed appellant "associat[ing]" with SGT Anderson in the vicinity of the barracks and

opined that it "looked suspicious." Finally, while he was compiling the list of names to present to the unit commander for urinalysis, 1SG Sharp found it necessary to advise two soldiers, SGT Rouse and PFC Gochenaur, of their "rights, and began to ask [them] questions." In such circumstances, we conclude that the military judge legally erred in holding the challenged urinalysis was shown by clear and convincing evidence to be a valid "inspection" within the meaning of Mil.R.Evid. 313(b). *See United States v. Thatcher,* 28 MJ 20, 25 (CMA 1989); *see also United States v. Konieczka, supra* at 297; *cf. United States v. Barnett,* 18 MJ 166, 171 (CMA 1984); *United States v. Johnston, supra.*

## II

## INSUFFICIENT PROBABLE CAUSE SEARCH

Trial counsel somewhat more enthusiastically argued that 1SG Sharp had probable cause to advise the company commander to direct the challenged urinalysis of appellant. *See* Mil.R.Evid. 315; *Murray v. Haldeman,* 16 MJ 74 (CMA 1983), *cited in* Drafters' Analysis of Mil.R.Evid. 312(d), Manual, *supra* at A22–19. In this regard, he elicited testimony from 1SG Sharp that he believed that he had probable cause to conduct the urinalysis or more accurately to advise the commander to direct the urinalysis.

The military judge did not make a finding on probable cause, and the Court of Military Review did not address this issue in its opinion. Moreover, before this Court, the Government has not taken the position that the challenged urinalysis could be lawfully justified on this basis. Nevertheless, our conclusion that the command-directed urinalysis was not shown to be a Mil.R.Evid. 313(b) inspection requires a brief comment on whether it could lawfully be justified as a search based on probable cause. Mil.R.Evid.

---

1. Neither at trial nor on appeal has the Government argued that the legality of the challenged urinalysis under Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1984, can be determined without consideration of 1SG Sharp's conduct. *See generally United States v. Konieczka,* 31 MJ 289, 296–97 (CMA 1990); *United States v. Lange,* 15 USCMA 486, 489–90, 35 CMR 458, 461–62 (1965).

315; *see United States v. Johnston, supra.* But cf. *United States v. McClain,* 31 MJ 130, 133–34 (CMA 1990) (probable cause to search does not necessarily expiate unlawfulness of search which was originally based on consent that is later found to have been given involuntarily).

This Court recently set forth the framework in which to review a search authorization based on probable cause. *United States v. Figueroa,* 35 MJ 54 (CMA 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993). In the context of a search of an accused's quarters, Judge Gierke wrote:

> Mil.R.Evid. 315(f)(2), Manual for Courts–Martial, United States, 1984, provides, "Probable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located in the place [or on the person] to be searched." In determining whether the base commander had probable cause to authorize the search of appellant's quarters, the question is "whether, given all the circumstances set forth in the affidavit before him, ... a fair probability" exists that the weapons would be found in appellant's quarters. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Our duty as a reviewing court is to ensure that the commander "had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332, *citing Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960); *see United States v. Walters,* 22 USCMA 516, 518, 48 CMR 1, 3 (1973).

35 MJ at 55–56 (footnote omitted).

■ Examination of the record in this case fails to meet the above standard. A bald assertion of probable cause, of course, is not sufficient to meet this test. Moreover, a general suspicion of criminal activity based on an unspecific hearsay report coupled with speculation based on association with known

2. The challenged urinalysis in this case was ordered by appellant's company commander on the advice of 1SG Sharp. Our conclusion that 1SG Sharp had no substantial basis for finding proba-

criminal offenders is also an insufficient basis to establish probable cause. *Cf. Illinois v. Gates, supra.* Such a showing did not provide a substantial basis for anyone to conclude that there was a "fair probability" that metabolites of cocaine were in appellant's urine. *See* Mil.R.Evid. 315(f). Therefore, the urinalysis test in this case and evidence of its results should not have been admitted at appellant's court-martial. Mil.R.Evid. 315(a), and 311(a) and (b)(3).[2]

### III

### ILLEGALLY–DERIVED CONFESSION

■ The next question we must address is whether the illegality of the urinalysis under Mil.R.Evid. 313(b) also precludes admission of appellant's statements to CID on June 5 and 6, 1991. Mil.R.Evid. 311(a) generally prohibits admission of "evidence obtained as a result of an unlawful search and seizure...." Mil.R.Evid. 311(e)(2) further makes clear that this prohibition also applies to evidence derived from an unlawful search. That rule states:

> (2) *Derivative evidence.* Evidence that is challenged under this rule as derivative evidence may be admitted against the accused if the military judge finds *by a preponderance of the evidence that the evidence was not obtained as a result of an unlawful search and seizure,* that the evidence would have been obtained even if the unlawful search or seizure had not been made, or that the evidence was obtained by officials who reasonably and with good faith relied on the issuance of an authorization to search, seize or apprehend or a search warrant or an arrest warrant.

(Emphasis added.)

Trial counsel and appellate government counsel both argued that any possible taint from the urinalysis in this case was attenuated by the time appellant made his pretrial confessions. Trial counsel articulated his reasoning as follows:

ble cause applies as well to the commander he advised. Accordingly, the good-faith exception did not apply, *see* Mil.R.Evid. 311(b)(3)(B).

The long and short of it, Your Honor, is that when the accused came in for his interview some approximately twenty days after the urinalysis, he had the opportunity to decline to be interviewed. Nonetheless, he gave intelligent, knowing and free waiver and confessed to CID. In addition, this accused, this Sergeant, E–5, with a GT score of 118, he had approximately twenty days to figure out some way of reducing his potential liability or criminal culpability. He could have conferred with counsel, he could have taken the time to reflect on the possible legal consequences of the test or to take any other steps necessary to protect his interests. He did not. Any possible taint is therefore attenuated.

Government appellate counsel echoed this argument as follows:

Appellant's confession took place during a routine interview by law enforcement agents following up his positive urinalysis (R. 48–49, 62). Appellant cooperated with law enforcement agents, and returned the next day to execute another statement (P.E. 4). Appellant's confession was preceded by a complete rights warning, and took place 20 days after the urinalysis (*id.*). This voluntary confession was sufficiently attenuated from the urinalysis such that it was not the product of any alleged illegal government conduct. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248 [60 L.Ed.2d 824] (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254 [45 L.Ed.2d 416] (1975); *United States v. Ayala*, 22 MJ 777 (CMA 1986); *see also United States v. Phillips*, 32 MJ 76 (CMA 1991) (An unwarned, voluntary statement does not presumptively taint a later, warned statement. The decisive point is whether the later statement was voluntary.).

Answer to Final Brief at 10.

The military judge issued no ruling on this government argument since he denied the defense suppression motion on other grounds. The Court of Military Review likewise eschewed a decision on this question. For ourselves, we are not persuaded by it. In this regard, we note that the urinalysis results were delivered to appellant on June 5, 1991, the day he made his initial confession. In addition, we note that he was directed to bring the form notifying him of the positive results to the CID office on June 5, 1991. Finally, it was uncontroverted that the positive results of the challenged urinalysis were the sole basis for appellant's questioning by the military police investigator on June 5, 1991. In these circumstances, the prosecution has not shown by a preponderance of evidence that appellant's confessions were not obtained as a result of the challenged urinalysis. Mil.R.Evid. 311(e)(2). *Cf. United States v. Marquardt*, 39 MJ 239 (CMA 1994); *United States v. Phillips*, 32 MJ 76, 80–82 (CMA 1991). *See also* Mil.R.Evid. 311(e)(1).

## IV

## INEVITABLE DISCOVERY

■ Trial counsel next argued that appellant's confessions, even if derived from the positive urinalysis test, were admissible under the inevitable discovery rule. *See* Mil. R.Evid. 311(b)(2) and (e)(2); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Kozak*, 12 MJ 389 (CMA 1982). Trial counsel presented one witness, Military Police Investigator Leiser, to offer testimonial evidence in support of this government theory. In addition, both parties stipulated to the expected testimony of Investigator Broker, the military police investigator who interviewed appellant about the wrongful-use-of-cocaine charge.

Investigator Leiser testified during direct examination that he interrogated Specialist (SPC) McGee who also had tested positive on the urinalysis earlier discussed in this case. SPC McGee informed Investigator Leiser that he had smoked crack cocaine with appellant three or four times at SPC McGee's home. In response to questioning by the military judge, Investigator Leiser testified that he reviewed SPC McGee's statement "two or three times until we get it straight" and then he informed Investigator Broker of SPC McGee's accusations about appellant.

In the stipulation of expected testimony, then-Investigator Broker states that "[o]ur

office had not previously suspected SGT Campbell of being involved with cocaine or any other type of drug. I interviewed him solely because he was reported to have come up positive in an urinalysis." Broker states that, after "explain[ing] his rights to" appellant, he used a "question and answer" format during the interrogation. The questions and answers were typed on Department of the Army Form 2823, Sworn Statement, and signed by appellant. After asking appellant if he understood his "legal rights," the very first question appears to be "[h]ave you ever used controlled substances while in the military?" Appellant responded, "Yes." There was no evidence that suggests appellant knew of SPC McGee's implicating statements about alleged communal use or distribution of cocaine.

The military judge made the following findings regarding the inevitable discovery of appellant's statements based on SPC McGee's statements to Investigator Leiser:

> I also find that the Government would have inevitably focused upon the accused as a suspect as a result of the statement given by a Specialist McGee to CID. And I find that as a result of that statement, the Government would have clearly had probable cause to direct this specific accused undergo a urinalysis and would have clearly had reasonable basis for bringing the accused in for questioning. *Whether or not the accused would have made a statement or not, that's a bit of speculation, but I do find by clear and convincing evidence that the statement by Specialist McGee would have inevitably lead the Government to focus on Sergeant Campbell as a suspect in a criminal investigation.*

(Emphasis added.)

■ This Court reviews the military judge's determination of inevitable discovery for abuse of discretion. *United States v. Kaliski*, 37 MJ 105, 109 (CMA 1993). An abuse of discretion occurs

> if the findings of fact upon which he predicates his ruling are not supported by evidence of record; *if incorrect legal princi-*

ples were used by him in deciding this motion; or if his application of the correct legal principles to the facts of a particular case is clearly unreasonable. *United States v. Travers*, 25 MJ 61, 62–63 (CMA 1987); *United States v. Rosser*, 6 MJ 267, 271 (CMA 1979). *See United States v. Thomas*, 3 USCMA 161, 11 CMR 161 (1953).

*United States v. Williams*, 37 MJ 352, 356 (CMA 1993) (emphasis added). Here, the judge's ruling was premised on an incorrect legal principle.

In *United States v. Kaliski, supra,* this Court applied Supreme Court precedent in holding that "it is not enough to determine whether the witness would have been discovered independent of police illegality. . . . Accordingly, the degree of free will exercised by a witness is relevant in determining whether to apply the exclusionary rule to the witness' testimony." *Id.* at 109, *citing United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). In the case *sub judice,* the military judge stated that, based on the evidence presented, it would have been "a bit of speculation" to find that appellant would have made a statement to CID solely because of the statement given by SPC McGee and in the absence of positive results on the urinalysis. Instead, he found only that appellant's identity as a suspect would inevitably have been discovered. This, alone, is not enough to lawfully conclude that appellant's confession would inevitably have been procured. *Cf. United States v. Kaliski*, 37 MJ at 109.

## V

## HARMLESS ERROR

■ Appellant's conviction for using cocaine was based on evidence of a positive urinalysis, his own subsequent confessions, and testimony of an accomplice, SPC McGee. This Court has previously concluded that the urinalysis evidence and appellant's confessions were improperly admitted at his court-martial.[3] A remaining question is whether

---

3. The challenged confessions in this case were taken by military police agents as a result of the

inadmissible urinalysis results. Trial counsel, relying on Mil.R.Evid. 311(e)(2), also argued that

the findings of guilty to cocaine use can still be affirmed on the basis of harmless error. Mil.R.Evid. 103(a). *See Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). We think not.

The testimony of SPC McGee was offered for the purpose of proving that appellant both distributed cocaine to him in March 1991 and wrongfully used cocaine with him sometime in May 1991. The distribution of cocaine in March 1991 was the basis for specification 2 of Charge III, and SPC McGee's testimony was the only evidence offered by the prosecution against appellant for that specification. SPC McGee testified on direct examination that he and appellant smoked what SPC McGee believed was crack cocaine. During examination by defense counsel, SPC McGee testified that he had never "actually done crack cocaine" before, never held or touched cocaine before, "never smelled crack cocaine before," never saw "anyone high on cocaine before," and never saw it smoked from a beer can as he testified that he and appellant had smoked it. SPC McGee also testified that the smoked substance did not have any effect on him either in March or May; he never discussed drugs with appellant before, during, or after the March and May incidents; and appellant appeared and acted "the way he was acting before he inhaled this from the can." *The military judge entered a finding of not guilty to the distribution charge.*

This Court has previously upheld use of lay-witness testimony to express an opinion about the identity of a particular substance alleged to be a controlled substance. *United States v. Day,* 20 MJ 213 (CMA 1985). However, unlike the lay witness who testified to the identity of hashish in *Day,* SPC McGee had practically no experience with use or distribution of cocaine. We have doubts whether such uninformed lay testimony by

itself is "legal and competent evidence from which a court-martial may find or infer beyond a reasonable doubt ..." that appellant used cocaine in May of 1991. *United States v. Harper,* 22 MJ 157, 161 (CMA 1986); *cf. United States v. Tyler,* 17 MJ 381 (CMA 1984). In any event, it surely is not the type of evidence to persuade us that erroneous admission of the positive urinalysis evidence and appellant's confession on this charge was harmless error.[4]

## VI

## DECISION

The decision of the United States Army Court of Military Review is reversed as to specification 1 of Charge III. The findings of guilty thereon are set aside and that specification and Charge are dismissed. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for reassessment of the sentence based on the remaining findings of guilty.

Judge WISS concurs.

GIERKE, Judge (concurring):

I write separately for two purposes. First, I wish to disassociate myself from the implication in *United States v. Bickel,* 30 MJ 277 (CMA 1990), that a previously established and announced policy is a prerequisite for a valid inspection under Mil.R.Evid. 313, Manual for Courts–Martial, United States, 1984. While a previously established and announced policy is good evidence of a valid inspection, I am not ready to hold that it is required.

Secondly, I write to explain why I am joining the majority in this case after joining the majority in *United States v. Taylor,* 41 MJ 168 (CMA 1994), which reached an opposite result. In *Taylor* the commander's sub-

---

the "good faith" exception applied to the interrogation leading to appellant's confession. However, the military police investigator did not rely on issuance of a search authorization to interrogate appellant. Mil.R.Evid. 311(b)(3)(A).

4. We hold that the results of the urinalysis are not admissible under Mil.R.Evid. 313(b). *See*

Mil.R.Evid. 315(f) and 311(b). Therefore, we need not consider whether Mr. Smith's testimony satisfied the requirement for expert testimony to explain the presence of metabolites of cocaine, benzoylecgonine or BZE, in appellant's urine sample. *See United States v. Hunt,* 33 MJ 345 (CMA 1991); *United States v. Boulden,* 29 MJ 44 (CMA 1989).

ordinates withheld information from him. I was unwilling to attribute the knowledge and motives of subordinates to the commander. In the case before us the first sergeant discussed his compilation of the list with his commander. The first sergeant testified that he informed the commander "of everything I had done." The commander examined the list of potential test subjects and consulted with the first sergeant about names to be removed because of the limited number of urinalysis bottles available. The commander in this case was well aware of the first sergeant's activities and participated in them. Accordingly, I concur in the majority's holding that there was not a valid inspection under Mil.R.Evid. 313.

CRAWFORD, Judge (concurring in the result):

I disagree with the following dictum in *United States v. Bickel,* 30 MJ 277, 286 (CMA 1990), that inspections be

pursuant to an established policy or guideline that will eliminate the opportunity for arbitrariness by the person performing the tests. *Cf. Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

Quoted, 41 MJ at 182.

To apply the rules in *Wells* governing automobile inventories to military inspection rules seems to be unsupported, unnecessary, and unwise.

COX, Judge (dissenting):

Why do we have a drug testing program in the Department of Defense? Because a few servicemembers are "suspected" of using drugs and the testing program provides a way to determine who they are.

Why doesn't the Fourth Amendment's bar against unreasonable searches and seizures prohibit such an invasive intrusion upon the private lives of servicemembers? *See Unger v. Ziemniak,* 27 MJ 349 (CMA 1989), for an excellent presentation by Chief Judge Everett of the legal justification of this "seizure" of body fluids of servicemembers without a showing of probable cause or a warrant. The bottom line is that servicemembers can-

not fight effectively if drugs are "coursing through the body of a user." *See Murray v. Haldeman,* 16 MJ 74, 80 (CMA 1983), *quoting United States v. Trottier,* 9 MJ 337, 349 (CMA 1980). Therefore, "inspections" of military members to determine if they have drugs "coursing through" their veins have long been recognized by this Court as legitimate, Constitutional, and reasonable seizures of the body fluids of servicemembers.

I beg my colleagues to re-read these early precedents. They are founded upon the accepted principle that in order to maintain an effective, well-disciplined fighting force, a commander must be able to inspect his troops for health problems, readiness, fitness for duty, and the like. Can one seriously disagree with that principle? If not, then ask yourself, what was appellant's chain of command trying to accomplish in this case? Was this a civilian police officer examining a citizen's private body fluids for illegal drugs or was it a military commander who was trying to ensure that his unit was ready for combat?

I suggest that in this case and in *United States v. Taylor,* 41 MJ 168 (CMA 1994), the evidence is overwhelming that the motive for the inspections was combat readiness and fitness, and that these inspections, albeit pervasive searches, were nevertheless reasonable under the precedents of this Court.

I recognize that I sometimes oversimplify matters, but for the life of me I cannot understand how reasonable people can hold, as a matter of law, that a general, invasive, intrusive seizure of private body fluids for no reason at all passes Constitutional muster; yet, if the same type seizure and inspection is ordered by a commander who is able to articulate a valid reason for such action, his inspection fails to meet the same Constitutional requirements. It just doesn't make sense to me. As the author of *United States v. White,* 27 MJ 264 (CMA 1988), I recognize that service regulations have carved out a subspecies of lawful searches and determined that "command directed" urinalysis test results are not to be used for military justice actions.

Apparently, Navy regulations do not have the same limitations as does the Air Force program. If they did, perhaps a case could be made that this case and *United States v. Taylor, supra*, represent situations akin to "command directed" searches. But then, what about the "good-faith" conduct of the commander? *See United States v. Lopez*, 35 MJ 35 (CMA 1992).

The bottom line for me is that both Taylor's and Campbell's commanders were operating under the same general principles. They were carrying out their duties as Constitutional officers of the United States to ensure that members of their respective troops were ready for war. Rather than condemning these men, however, I salute them. I would affirm.